**E-Filed 5/20/2009**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ALLIED HEALTH ASSOCIATION, INC. and KENNETH P. CALLISON,<br><br>Plaintiffs,<br><br>v.<br><br>ARTHROCARE CORPORATION, and DOES 1 THROUGH 100 INCLUSIVE,<br><br>Defendants. | Case No. C 05-04276 JF (RS)<br><br>ORDER[1] (1) GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT AND (2) TERMINATING AS MOOT MOTION TO EXCLUDE FINDINGS OF PLAINTIFF'S EXPERT<br><br>[Re: docket nos. 102 & 103] |

Defendant ArthroCare Corporation ("ArthroCare") moves for summary judgment on all claims by Plaintiffs Kenneth P. Callison ("Callison") and Allied Health Association, Inc. ("Allied"). Callison does not oppose the motion, and summary judgment in favor of ArthroCare will be granted with respect to Callison's individual claims. ArthroCare also seeks to exclude the testimony and findings of Allied's damages expert. The Court has considered the moving and responding papers filed by the parties, the oral arguments presented at the hearing on February 27, 2009, and the supplemental briefing requested by the Court on May 6, 2009. For the reasons set forth below, the motion for summary judgment as to Allied will be granted in part

---

[1] This disposition is not designated for publication in the official reports.

Case No. C 05-4276 JF (RS)
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT ETC.
(JFLC1)

and denied in part, and the motion to exclude the findings of Allied's expert will be denied as moot.[2]

## I. BACKGROUND

Allied is a Colorado-based company that markets and distributes both cosmetic products and liability insurance to the health and beauty industries. *See* Compl. ¶ 1. Callison is the President and Director of Allied. Maczka Decl. ¶ 1. ArthroCare is a medical device company based in Sunnyvale, California and is the manufacturer of the Visage MicroTouch ("MicroTouch") system. *See* Compl. ¶ 1; Maczka Decl. ¶ 2. The MicroTouch system is designed for cosmetic treatments and utilizes a patented electrosurgical technology called coblation. Maczka Decl. ¶ 2. It consists of a controller, a flow control unit and single-use, disposable wands. *Id*. The MicroTouch system is a Class II medical device and thus is subject to certain resale restrictions as set forth in applicable Food and Drug Administration ("FDA") regulations. *See* Prothro Decl. Ex. J.[3] At all relevant times, in accordance with 21 C.F.R. § 801.109(b)(1), the MicroTouch contained the following labeling: "Federal (USA) law restricts this device to sale by or on the order of a physician." Maczka Decl. Ex. K.

On March 6, 2002, Allied and ArthroCare entered into a distribution agreement (the "Distribution Agreement"), pursuant to which Allied was granted the exclusive right to market, sell and distribute the MicroTouch system to non-physician-owned spas, clinics, and beauty salons throughout the United States. *See* Compl. ¶ 4; Distrib. Agreement § 1. Under the Distribution Agreement, sales to physicians or physician-owned enterprises required ArthroCare's prior approval. Distrib. Agreement § 1. ArthroCare also was responsible for all

---

[2] Allied's Request for Judicial Notice ("RJN") of certain business documents, court filings, state records, and federal regulations will be granted in full.

[3] Allied disputes this characterization of the MicroTouch system. *See* Samaras Decl. Ex. 2. An instrument is categorized as Class II device if general controls alone are insufficient to provide reasonable assurance of its safety and effectiveness and there is sufficient information to establish special controls. *See* 21 U.S.C. § 360c(a)(B); 21 C.F.R. § 860.3(c)(2). In response to Allied's contentions, ArthroCare has presented sufficient evidence, including a letter from the FDA, to permit a legal conclusion that the MicroTouch system is a Class II device. *See* Prothro Decl. Ex. J.

regulatory filings and the provision of any documentation necessary for Allied to gain regulatory approval for its marketing and sales activities. *Id*. § 9. In turn, Allied was obligated to distribute units of the MicroTouch system "in a manner consistent with their labeling." *Id*.

The Distribution Agreement contained quarterly and annual minimum purchase requirements. For each quarter of the first year, Allied was required to purchase twenty controllers, twenty flow control units, and increasing numbers of wands (400 for Q1, 800 for Q2, 1,200 for Q3, and 1,600 for Q4). Distrib. Agreement § 5. Increased purchase requirements for all three components were scheduled for years two and three. *Id*. In the event that Allied failed to meet these purchase requirements, ArthroCare had the right to "(1) terminate this agreement; (2) convert Allied's exclusive rights to non-exclusive distribution rights; or (3) continue under the terms of the existing agreement." *Id*. § 5. The Distribution Agreement also contained a termination provision, which provided that either party could terminate if the other party had "breached or defaulted in the performance of any of its material obligations or representations…and such default shall have continued for sixty (60) days after written notice thereof was provided to the breaching party." *Id*. § 10. The Distribution Agreement was to be governed by California law. *Id*. § 13.

Because sales of the MicroTouch system required an order by a physician, Allied engaged the services of Dr. Alfred L. Caruso ("Dr. Caruso"), a California physician. *See* Long Decl. Ex. L at 169-70, 295. Dr. Caruso provided Allied with a blanket physician order form. *Id.* at 295. When an order was placed, the name of the customer ordering the device was typed onto a photocopy of the order form to indicate that Dr. Caruso had authorized the order, but this practice occurred without the customer's knowledge. *Id*. at 295, 331-34. Dr. Caruso was paid a flat fee for each use of the purchase order form. *See id.* at 303. Allied did not notify Dr. Caruso each time it used his blanket order form, nor did Dr. Caruso have any contact with purchasers of the MicroTouch system. *Id*. at 169-70, 303, 331. Callison has admitted that Dr. Caruso did not train or supervise any spa employees and that the blanket order form was used "merely to meet FDA requirements." Long Decl. Ex. R. In addition, and unknown to ArthroCare during the period that the Distribution Agreement was in effect, Dr. Caruso's California state medical license had

been suspended in July 2003 for multiple acts of misconduct.  *See* RJN Ex. C.  Dr. Caruso's New York license was suspended on October 30, 2003 as a consequence of the action taken by the California Medical Board.  *Id*. Ex. D.

        The Distribution Agreement could be modified or amended only by a writing signed by both Allied and ArthroCare.  Distrib. Agreement § 15.  On September 6, 2002, the parties entered into a written amendment (the "First Amendment"), which expanded Allied's distribution territory to include certain foreign countries and granted Allied a non-exclusive right to sell MicroTouch controllers and wands to physicians with cosmetic or aesthetic practices.  First Amendment § 1.  In exchange for these expanded rights, Allied committed to increased minimum purchase requirements.  The terms of the First Amendment expressly replaced § 1 ("Appointment Grant"), § 2 ("Product Manufacture and Sale"), and § 5 ("Minimum Purchases") of the Distribution Agreement, and to the extent that any provision of the First Amendment conflicted with the terms of the Distribution Agreement, the language of the First Amendment controlled.  *Id*. § 5.  All other terms of the Distribution Agreement remained binding and in effect, and any future amendments were required to be in writing.  *Id.*

        Shortly thereafter, on September 25, 2002, ArthroCare offered Allied an incentive:  if Allied purchased and paid for fifty controllers by September 27, 2002, ArthroCare would give Allied seventy free controllers that would count toward its minimum purchase requirements for 2003 (the "Incentive Agreement").  The parties have not presented any contemporaneous writing memorializing the Incentive Agreement.  Allied placed an order for fifty controllers but did not pay for them.  As of June 2003, Allied owed ArthroCare approximately $150,000 for the fifty controllers.  On June 20, 2003, the parties entered into a second written amendment (the "Second Amendment").  The Second Amendment replaced §§ 1, 2, and 5 as well as § 6 ("Payments") of the Distribution Agreement/First Amendment.  The Second Amendment recited the following with respect to the Incentive Agreement:

> On September 25, 2002, ArthroCare agreed to ship 70 controllers to Allied at no charge provided Allied purchased 50 controllers at a price of $3000 each no later than September 27, 2002.  Once these controllers are paid for and Allied's account with ArthroCare is current, ArthroCare will ship the remaining controllers to Allied

with the only charge to Allied being for shipping.
Second Amendment § 5. With respect to Allied's outstanding balance at the time, the Second Amendment stated as follows:

> [T]he parties recognize that Allied has an outstanding balance in excess of $150,000 that is significantly greater than net thirty (30) days. Allied agrees to pay ArthroCare $50,000 of this outstanding balance no later than June 30, 2003. Beginning September 1, 2003, Allied will make monthly payments of $20,000 on the first of each month until Allied's outstanding balance is paid in full. If Allied fails to make any such payment within 30 days of the date it is due (with the exception of the payment due June 30 which must be paid by that date), ArthroCare shall have the right to terminate the Distribution Agreement immediately with no notice to Allied.

*Id*. § 6. The Second Amendment also reduced the minimum purchase requirements for the remaining two quarters of 2003 to zero, and for 2004 the purchase requirements were changed from quarterly obligations to biannual purchase requirements of sixty controllers, sixty control units, and five hundred wands for each six-month period of 2004. *Id*. § 5. The Second Amendment provided that should there be any conflict with the Distribution Agreement or the First Amendment, the language of the Second Amendment would control. *Id*. at 4. Neither the First or Second Amendment modified or replaced the language of the termination provision contained in § 10 of the original Distribution Agreement. As with the original Distribution Agreement and the First Amendment, any future modification to the agreement between the parties was required to be in writing. *Id.* at 4-5.

Despite the obligations set forth in the Second Amendment, Allied initially failed to make regular payments on its outstanding $150,000 debt. *See* Long Decl. Ex. L22. Allied eventually tendered a lump-sum payment of $100,000 in January 2004, effectively eliminating the outstanding balance owed under the Incentive Agreement. Maczka Decl. Ex. I. According to ArthroCare, after this payment Allied again fell behind on payments for the products it purchased during the first half of 2004. Long Decl. Exs. L13 & S. In addition, ArthroCare alleges that as of June 30, 2004, Allied had purchased only six controllers and three flow control units for the first six months of the year, breaching its obligation to purchase sixty controllers and sixty flow

5

Case No. C 05-4276 JF (RS)
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT ETC.
(JFLC1)

control units.[4]  Long Decl. Ex. S.  Allied did satisfy its purchase requirement for wands.  *Id*.
Allied contends that it placed an order for a sufficient number of controllers and flow control
units in January 2009, and that ArthroCare failed to fill the order.

On July 13, 2004, ArthroCare provided written notice that it was terminating the
Distribution Agreement.  The letter from ArthroCare's vice president of legal affairs stated as
follows:

> As you know, pursuant to Section 6 of the [Second Amendment],
> Allied Health agreed to purchase a minimum quantity of products
> in the first half of 2004 (60 Controllers, 60 Flow Controls and 500
> Disposable Products).  As of the date of this letter, Allied Health
> has failed to purchase the minimum quantity of products required
> in the Agreement for this time period.  Accordingly, pursuant to
> Section 6 of the [Second Amendment], ArthroCare is exercising its
> right to terminate the Agreement for Allied's material breach
> thereof.  This letter serves as notice to Allied Health that effective
> immediately, the Agreement is terminated and all rights granted to
> Allied Health in this Agreement are no longer in effect as of the
> date of this letter.

Long Decl. Ex. A2.  Allied argues that ArthroCare's abrupt and immediate termination violated §
10 of the Distribution Agreement and its subsequent amendments, which required sixty days'
written notice prior to termination.  ArthroCare contends that it had the right to terminate the
Distribution Agreement immediately because the notice provision of § 10 did not apply to
Allied's failure to meet its purchase obligations.

After ArthroCare terminated the Distribution Agreement, it had to communicate with
Allied's former customers with respect to various issues, including questions related to operation
of the MicroTouch system, returned components, repairs, and sales inquiries.  To assist
ArthroCare's customer service representatives in these communications, ArthroCare created an
internal memorandum for use when speaking with Allied's former customers over the telephone,
as well as a form letter for external distribution.  The letter stated that the Distribution Agreement

---

[4] Although the parties dispute the numbers of components actually ordered by Allied during the relevant time periods, ArthroCare has submitted Allied's data for such orders, arguing that even if Allied's numbers are used it is evident that Allied failed to meet its obligations by purchasing fewer than ten controllers and flow controller units during the first half of 2004.  *See* Long. Decl. ¶¶ 9-10 and Ex. S.

6

between Allied and ArthroCare had been terminated and that any outstanding payment obligations should be paid to ArthroCare directly. *See* RJN Ex. A3. The letter also stated that the MicroTouch is a Class II medical device and "[i]f a customer does not have any association with a physician, Allied Health was in direct breach of its contract with ArthroCare when it sold the system to them…the sale of such system to an organization that is not associated with a physician is in direct violation of Federal Law…[and] any legal remedies [the customer] may wish to pursue should be pursued against Allied." *Id*. Allied also alleges that former customers were told that Allied had sold ArthroCare's products "illegally." Compl. ¶ 18.

On July 12, 2005, Allied and Callison filed the instant action in the Santa Clara Superior Court, alleging breach of the Distribution Agreement as well as claims for libel and slander for the written and oral statements made by ArthroCare to Allied's customers after the termination of the Distribution Agreement. ArthroCare removed the action to this Court pursuant to 28 U.S.C. § 1441(b).

## II. LEGAL STANDARD

Summary judgment should be granted only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, or other evidence that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this initial burden, the burden shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324. Once the moving party meets this burden, the nonmoving party may not rest upon mere allegations or denials, and instead must present evidence sufficient to demonstrate that there is a genuine issue for trial. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).

Fed. R. Civ. P. 56(d) gives the Court discretion to grant partial summary judgment. "If summary judgment is not rendered on the whole action, the court should, to the extent

practicable, determine what material facts are not genuinely at issue…It should then issue an order specifying what facts—including items of damages or other relief—are not genuinely at issue. The facts so specified must be treated as established in the action." Fed. R. Civ. P. 56(d).

### III.  DISCUSSION

#### A.  Breach of the Distribution Agreement

To prevail on a breach of contract claim, a plaintiff must show (1) the existence of a valid contract; (2) plaintiff's performance or an excuse for nonperformance; (3) breach by the defendant; and (4) damages.  *Careau & Co. v. Sec. Pac. Bus. Credit*, Inc., 222 Cal. App. 3d 1371, 1388 (1990).  ArthroCare argues that it had the right to terminate the Distribution Agreement immediately pursuant to § 5 because Allied was in material breach by failing to purchase the minimum number of controllers.  ArthroCare also asserts that Allied's overdue balance of approximately $10,000 as of July 2004 as well as Allied's failure to comply with applicable FDA regulations presented additional grounds for immediate termination.  In response, Allied contends that it (1) satisfied its minimum purchase requirements; (2) paid its outstanding balance shortly after receipt of the termination letter; and (3) did not have to comply with any FDA regulations because the MicroTouch was not Class II medical device.  Allied thus argues that ArthroCare committed a material breach by not complying with the notice provision of § 10 of the Distribution Agreement.

##### 1.  Breach of Purchase Requirement Obligation

The July 2004 notice of termination cited only a failure by Allied to purchase a sufficient number of controllers during the first half of 2004.[5]  It is undisputed that Allied purchased a sufficient number of wands.  However, the parties disagree strongly as to whether Allied ever placed an order for sufficient numbers of controllers and flow control units.  Allied contends that

---

[5] The termination letter cited the incorrect section (§ 6) of the Distribution Agreement and its subsequent amendments.  The operative purchase requirement is set forth in § 5 of the Second Amendment, while § 6 treats Allied's outstanding balance under the Incentive Agreement and sets forth a payment schedule for that particular balance.  Allied's payment obligations for purchased products also are described in § 6, but this provision is silent with respect to the remedies available to ArthroCare if Allied did not make timely payments.

it indicated in a series of emails in January 2004 that it intended to place an order for approximately sixty-six controllers and seventy flow control units pending its receipt of shipping addresses, which apparently never occurred. ArthroCare argues that the failure to provide the shipping addresses meant that Allied had rescinded its purchase order. However, as discussed in further detail below, this dispute does not preclude the Court from resolving the question of whether Allied was in breach of the Distribution Agreement.

Allied paid the outstanding balance owed under the Incentive Agreement in January 2009. Shortly thereafter, it notified ArthroCare that it would request shipment of the free controllers pending receipt of customer shipping addresses. There is no genuine dispute that Allied did not place a separate and subsequent *purchase* order for at least sixty controllers for which it would have to pay pursuant to § 5 of the Second Amendment. Accordingly, Allied must show that the seventy free controllers owed under the Incentive Agreement could be used to meet its purchase requirements, irrespective of whether a proper order actually was placed.

Allied contends that there is at least an unresolved question of fact as to whether the parties intended that the free controllers would count toward the purchase minimums for the first part of 2004, because the parties initially had intended that these controllers would count toward Allied's 2003 purchase requirements. This issue may be resolved by properly construing the terms of the Distribution Agreement. Interpretation of a contract is a question of law. *Oceanside 84, Ltd. v. Fidelity Fed. Bank*, 56 Cal. App. 4th 1441, 1448 (1997). "When a dispute arises over the meaning of contract language, the first question to be decided is whether the language is 'reasonably susceptible' to the interpretation urged by the party. If it is not, the case is over." *S. Cal. Edison Co. v. Sup. Ct.*, 37 Cal. App. 4th 839, 847 (1995).

Allied's minimum purchase obligations for the first and second halves of 2004 were sixty controllers per period. Second Amendment § 5. The September 2002 Incentive Agreement is described in a separate paragraph within § 5, which is silent with respect to the relationship, if any, between the seventy free controllers and Allied's obligation to purchase sixty controllers. Accordingly, the plain language of § 5 does not support Allied's argument that the respective

rights and obligations of the parties under the Incentive Agreement could be used to modify the purchase requirement provision. Indeed, the terms of the Incentive Agreement had been executed in part when the parties entered into the Second Agreement, as ArthroCare already had shipped fifty controllers to Allied. *See id*. §§ 5-6. All that remained for the Incentive Agreement to be consummated in full was for Allied to pay the $150,000 to ArthroCare for those fifty controllers, and then ArthroCare would ship the seventy free controllers to Allied. *Id*. In addition, § 5 required that Allied "purchase" sixty controllers during the first half of 2004. Any controllers "purchased" by Allied were to be sold at a price of $3,000 per controller. *Id*. § 2. Seventy "free" controllers cannot be "purchased" at $3,000 per unit. Accordingly, as a matter of law, the Second Amendment does not allow the use of the seventy free controllers to satisfy Allied's 2004 purchase requirements. Allied had an obligation—separate from the Incentive Agreement—to purchase at least sixty controllers during the first half of 2004. Its failure to do so constituted a breach of the Distribution Agreement.[6] *See* Witkin Summary of Cal. Law § 849 (10th Ed. 2005) ("The unjustified failure to perform a material promise or covenant, where the contract is entire, is a breach."). In addition, while the determination of whether "a breach is so material as to constitute cause for the injured party to terminate a contract is ordinarily a question for the trier of fact," *Whitney Inv. Co. v. Westview Dev. Co.*, 273 Cal. App. 2d 594, 601 (1969), there can be no genuine dispute that Allied's *actual* purchase of only handful of controllers constituted a material breach of the Distribution Agreement. *See Quality Wash Group V, Ltd. v. Hallak*, 50 Cal. App. 4th 1687, 1685 (1996) (whether a party breached the terms of a properly construed contract also is a question of law if the underlying material facts are not in dispute.).

---

[6] In a recorded telephone call with an ArthroCare employee shortly after the termination, Callison admitted that Allied had not purchased the required minimum number of products in the first half of the year. *See* Long Decl. Ex. L21. Then, in a July 23, 2004 letter, Allied contended that the January 2009 purchase order for sixty-six controllers satisfied its purchase obligation. *See* Maczka Decl. Ex. J. However, as discussed above, the record shows that those sixty-six controllers referred to the free controllers owed to Allied under the Incentive Agreement. *See id*. Exs. J & J1; Long Decl. Exs. L16-1, L22. In addition, Callison admitted at his deposition that there was no written agreement stating that the seventy free controllers could count as a credit towards Allied's minimum purchase obligations for 2004. *See* Long Decl. Ex. C at 230.

## 2. Applicable Termination Provision for Breach of Purchase Requirement Obligation

"A breach does not terminate a contract as a matter of course but is a ground for termination at the option of the injured party." *Whitney*, 273 Cal. App. 2d at 602. A "contract may contain a valid provision giving one or the other party an option to terminate it on specified conditions." *Call v. Alcan Pac. Co.*, 251 Cal. App. 2d 442, 447 (1967). ArthroCare argues that the express language of § 5 in the Second Amendment gave it the right to terminate the Distribution Agreement immediately once it was evident that Allied had failed to meet its purchase obligations for the first half of 2004. This provision—both in the original Distribution Agreement and its subsequent amendments—stated that if Allied failed to fulfill its purchase obligations ArthroCare had "the right to (1) terminate this agreement; (2) convert Allied's exclusive rights to non-exclusive rights; or (3) continue under the terms of the existing agreement." Second Amendment § 5. Citing *Continental Casualty Co. v. Zurich Insurance Co.*, 57 Cal. 2d 27 (1967), ArthroCare contends that the language of § 5—rather than that of § 10—sets forth its termination rights, because § 5 addresses Allied's purchase requirements specifically. *See id.* at 35 ("When general and specific provisions of a contract deal with the same subject matter, the specific provision, if inconsistent with the general provision," controls). However, the Court is not convinced that this rule applies here. The "subject matter" at issue is the means by which a party may terminate the Distribution Agreement. The purchase requirement provision grants ArthroCare a right of termination, but it is silent with respect to the procedure for exercising that right. In other words, with respect to the proper procedure for terminating the contract § 5 is not more specific than § 10, because § 5 says nothing at all about the termination procedure. If the parties had intended to provide for a termination procedure that departed from that described in § 10, they could have included specific language to that effect as they did in § 6, which granted ArthroCare the "right to terminate the Distribution Agreement immediately with no notice to Allied" if Allied failed to fulfill its payment obligations under the Incentive Agreement. *See Fru-Con Const. Corp. v. Sacramento Mun. Utility Dist.*, No. CIV. S-05-583, 2007 WL 1791699, at *7 (E.D. Cal. June 15, 2007) ("Under California law, a court is

11
Case No. C 05-4276 JF (RS)
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT ETC.
(JFLC1)

'bound to give effect to the plain and ordinary meaning of the language used by the parties.'") (quoting *Coast Plaza Doctors Hosp. v. Blue Cross of Cal.*, 83 Cal. App. 4th 677, 684 (2000)).

ArthroCare asserts generally that Allied cannot prevail on its breach of contract claim because it failed to meet the purchase obligation. *See Reichert v. Gen. Ins. Co. of Am.*, 68 Cal.2d 822, 830 (1968) (successful claim for breach of contract requires "plaintiff's performance or excuse for nonperformance"). This argument thus assumes that Allied's material breach of its purchase obligation allowed ArthroCare to avoid the provisions of § 10. However, such a result would require the Court to ignore the express language of the Distribution Agreement. In addition, "[i]f the two covenants are independent, breach of one does not excuse performance of the other." *Verdier v. Verdier*, 133 Cal. App. 2d 325, 334 (1955). Here, ArthroCare's obligations under § 10 are not dependent on Allied's performance under § 5 because these two separate sections relate to entirely distinct contractual obligations. *See id.* Accordingly, the Court concludes that ArthroCare did not have the right to terminate the Distribution Agreement for Allied's failure to purchase a sufficient number of controllers without adhering to the provisions of § 10.[7] Distrib. Agreement § 10. While Allied's past performance was somewhat uneven, it is conceivable that Allied could have placed an order—though admittedly a tardy one—that would have remedied its prior breach. *See* Restatement (2d) of Contracts § 237 ("Even if the failure is material, it may still be possible to cure it by subsequent performance without a material failure.").

### 3. Failure to Comply with Product Labeling

The labeling on the MicroTouch System stated "Federal (USA) law restricts this device to sale by or on the order of a physician." Maczka Decl. Ex. K. This labeling was required because the FDA had classified the MicroTouch as a Class II device. *See* Prothro Decl. Ex. J. The Distribution Agreement required that Allied "distribute the Products in a manner consistent with their labeling." Distrib. Agreement § 9. No reasonable jury would agree with Allied's

---

[7] Likewise, there is no language in the Second Amendment that indicates that ArthroCare had the right to terminate the Distribution Agreement immediately because Allied owed $10,000 for products it did actually purchase pursuant to § 5.

contention that it satisfied this obligation through the use of Dr. Caruso's blanket order form. Dr. Caruso never met any of the customers. In addition, any sales to customers outside of California or New York should have been made through a physician licensed in those states. *See* 21 C.F.R. § 801.109(b)(1) ("practitioner" designated on labeling must be "licensed by the law of the State in which he practices to use or order the use of the device."). Allied's purported belief that a physician association was unnecessary is belied by its retention of Dr. Caruso in the first place. Allied's failure to distribute the product to customers without prior physician approval could have created confusion among consumers and even serious health risks. In fact, a customer submitted a letter shortly after the July 2004 termination expressing concern that it had been misinformed about the FDA regulations governing the use of the MicroTouch System. *See* Long Decl. Ex. Q.

"The general rule is that if the breach is a material breach, it may give grounds for the non-breaching party to cancel the contract, but if the breach is a partial breach, the non-breaching party's remedy is for damages." *Comedy Club, Inc. v. Improv West Assocs.*, 514 F.3d 833, 847 n.12 (9th Cir. 2007), *vacated and remanded on other grounds*, 129 S. Ct. 45 (2008). In the instant case, Allied's use of Dr. Caruso was a material breach. In addition, the failure to cite proper justification for the breach in the July 2004 letter does not preclude a finding that ArthroCare nonetheless had a right to terminate the Distribution Agreement immediately. *See Wilson v. Lewis*, 106 Cal. App. 3d 802, 809 (1980) ("if facts exist that justify a rescission by one party, and he declares a rescission in some effectual manner, he terminates the contract.") (citation omitted). Moreover, the terminating party need not cite the proper reason for cancellation in the notice. *See id.* ("One may justify an asserted rescission by proving that at the time there was an adequate cause although it did not become known to him until later.") (quoting *Earl v. Saks & Co.*, 36 Cal. 2d 602, 609 (1951)).[8]

---

[8] For purposes of the instant motion, the determination as to whether ArthroCare "terminated," "cancelled," or "rescinded" the Distribution Agreement is unnecessary, as under the instant circumstances either has the same essential import. *See* 26 Williston on Contracts § 68:3 (4th ed.) ("There are other words by which the result may be described, and whether a

13

The Court concludes that this breach was sufficiently material to allow immediate termination of the Distribution Agreement.[9] Allied's failure to distribute the products properly over a significant period of time was not curable because there was no realistic means to remedy any harm that could have been caused by such a breach. As the Fifth Circuit has stated:

> As a general rule, a party to a contract may break it, by renouncing his liabilities under it; by rendering performance of his promise impossible, or by totally or partially failing to perform his agreement or undertaking. When either party to a contract fails to perform any of his terms, the contract has been broken. Moreover, if the breach of the contract is such that upon a reasonable construction of the contract, it is shown that the parties considered the breach as vital to the existence of the contract, such a breach will discharge the other party from the performance of his promise.

*Olin Corp. v. Cent. Indus., Inc.*, 576 F.2d 642, 647-48 (5th Cir. 1978) (citation omitted). Unlike a breach for failure to purchase a sufficient number of products, prior actions in contravention of applicable FDA regulations could not be remedied. *See L.K. Comstock & Co., Inc. v. United Eng'rs & Constructors Inc.*, 880 F.2d 219, 232 (9th Cir. 1989) (a "vital" breach, as opposed to a "curable" breach, allows the nonbreaching party to rescind the agreement immediately).

In addition, Allied's actions created a safety issue. By July 2004, Allied had distributed products without complying with FDA regulations. Such circumstances created a right of immediate termination. *See Rand Intern., Inc. v. LucasFilm Ltd.*, C 08-03897, 2008 WL

---

contract is spoken of as terminated, abrogated, annulled, avoided, discharged, or rescinded is not in itself important…It is sometimes assumed that rescission of a contract necessarily involves a restoration of the previous status with restitution of anything received by either party, or its value. This is not necessarily the case where rescission is by mutual assent, *and in many cases where a partly performed contract is rescinded by the act of one party for the fault of the other*, restoration of what has been received, or its value, is not a condition qualifying the right to rescind.") (emphasis added).

[9] In its supplemental brief, ArthroCare alleges that Allied also had informed customers that the MicroTouch wand could be used up to eight times, despite the fact that the wands were supplied as sterile and the packaging specifically stated that the wands should be used only once and then discarded. *See* Maczka Decl. Ex. K. However, there is no evidence in the record as to when such a statement may have been made. If true, this allegation would present a separate ground for immediate termination.

1  3987079, at *3 (N.D. Cal. Aug. 27, 2008) ("the Court could find that a breach which threatens
2  public health or safety, or threatens to do significant harm to the Licensor or its commercial
3  reputation, may, in fact, render such breach incurable."). *See also* Cal. Civ. Code § 1689(b)(6)
4  (contract may be rescinded "[i]f the public interest will be prejudiced by permitting the contract
5  to stand.").

6  However, while ArthroCare thus had proper grounds for terminating the Distribution
7  Agreement, it is undisputed that it never delivered the bulk of the free controllers due to Allied
8  under the Incentive Agreement. Because Allied no longer is an authorized distributor of the
9  MicroTouch system, delivery of the free controllers is not feasible. Under these circumstances,
10 Allied still may be owed restitution (*e.g.*, $3,000 per controller) for each free controller that was
11 not delivered by ArthroCare.[10] Accordingly, ArthroCare is entitled only to partial summary
12 judgment on Allied's breach of contract claim.[11]

13  B.  Libel and Slander Claims

14  The elements of the defamatory torts of libel and slander are "(a) a publication that is (b)
15 false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that
16 causes special damage." *Taus v. Loftus*, 40 Cal. 4th 683, 720 (2007) (quoting Witkin § 529). A
17 showing that a statement was "substantially true" constitutes a defense to a defamation claim.
18 *Hughes v. Hughes*, 122 Cal. App. 4th 931, 936 (2004) ("To establish the defense of truth—*i.e.*,

---

[10] Allied has not moved for summary judgment on this issue and thus it is not properly before the Court. *See* Civ. L.R. 7-2.

[11] Even if ArthroCare's decision to terminate the Distribution Agreement immediately had been improper, Allied would be unable to recover for any hypothetical lost sales beyond March 6, 2005. The initial term of Distribution Agreement was three years and was set to renew automatically, but only if Allied "exceeded the minimum requirements for the purchase of Products from ArthroCare in each period." Distrib. Agreement § 10. Allied failed to purchase the required quantity of controllers for the first half of 2004. Allied's argument that the Second Amendment's inclusion of a schedule of purchase requirements through 2008 somehow overrides the automatic renewal conditions set forth in § 10 is not convincing, especially since the Second Amendment expressly stated that "[e]xcept as amended herein, all other provisions of the Distribution Agreement and the First Amendment remain in full force and effect." Second Amendment at 5.

1  that the statement is not false—defendants do not have to prove the 'literal truth' of the statement
2  at issue."). "Minor inaccuracies" are permissible so long as the substance of the statement is
3  true. *See id.* (quoting *Masson v. New Yorker Magazine* 501 U.S. 496, 516-517 (1991)). In other
4  words, a statement is sufficiently truthful if its "imputation is substantially true so as to justify the
5  'gist or sting' of the remark." *Campanelli v. Regents of Univ. of Cal.*, 44 Cal. App. 4th 572, 582
6  (1996).

7  Allied does not oppose ArthroCare's motion for summary adjudication of its ordinary
8  libel and slander claims, and essentially concedes that it cannot demonstrate that it suffered
9  special damages. However, Allied contends that a showing of special damages
10 is not necessary because ArthroCare's oral and written communications were *per se* defamatory.
11 "Certain statements are deemed to constitute slander *per se*, including statements (1) charging the
12 commission of crime, or (2) tending directly to injure a plaintiff in respect to the plaintiff's
13 business by imputing something with reference to the plaintiff's business that has a natural
14 tendency to lessen its profits." *Mann v. Quality Old Time Serv., Inc.*, 120 Cal. App. 4th 90, 106-
15 07 (2004). Libel or slander *per se* does not require a showing of special damages. *Id.* at 107.
16 For purposes of a motion for summary judgment, the statements made by ArthroCare, if in fact
17 defamatory, could be found to constitute *per se* slander and libel. Accordingly, Allied's claim
18 does not fail for lack of a showing of special damages.

19 Allied opposes ArthroCare's motion only as to the following statements: (1) the written
20 statement sent to customers stating that Allied was in "direct violation of Federal Law" if it had
21 sold the MicroTouch system to a customer without "any association with a physician" and (2) the
22 oral statement to customers that Allied had sold the MicroTouch system "illegally." Allied
23 contends that the Distribution Agreement required only that Allied sell the MicroTouch system in
24 accordance with its labeling. The labeling on the MicroTouch stated "Federal (USA) law
25 restricts this device to sale by or on the order of a physician." Thus, Allied argues that there is a
26 material difference between "association with a physician" and "sale by or on the order of a
27 physician." As noted previously, Allied also has presented evidence that it claims supports its
28

position that the MicroTouch is not a Class II device.

The record does not support Allied's contentions. While it has presented some evidence from a search of FDA records to support the allegation that the MicroTouch is not subject to FDA regulation, ArthroCare has presented sufficient rebuttal evidence demonstrating that the MicroTouch system in fact is a Class II device. In addition, both ArthroCare and Allied understood that if the MicroTouch was a Class II medical device, it could be sold only to physicians or non-physicians with a physician's order.[12] Sale of such a device violates FDA regulations. *See* 21 C.F.R § 801.109-110; 21 C.F.R § 860.3.; 21 U.S.C. § 360c. Because the MicroTouch may be sold only with physician approval, and ArthroCare's warning to customers that Allied's sales violated FDA regulations (and thus were "illegal") was at least provably true, if not absolutely true. *See Campanelli*, 44 Cal. App. 4th at 582. Similar statements made against businesses have been held to be not actionable under applicable California law. *See*, *e.g.*, *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 730-31 (9th Cir. 1999) (statement that competitor did not have the capability to handle certain business was not actionable); *Franklin v. Dynamic Details, Inc.*, 116 Cal. App. 4th 375, 384-91 (2004) (statements alleging possible copyright infringement were not actionable because they had a sufficient basis in fact).

Nor is Allied's contention that there is a material difference between "association with a physician" and "sale by or on the order of a physician" particularly convincing. Indeed, considering the circumstances with respect to how Allied sold the MicroTouch, it is provably true that Allied's use of Dr. Caruso's blanket order form violated FDA regulations. *Franklin*, 116 Cal. App. 4th at 386-87. Accordingly, ArthroCare's motion for summary judgment on Allied's claims for libel and slander *per se* will be granted.

C. Motion to Exclude Testimony and Findings of Allied's Damages Expert

Pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509

---

[12] Callison essentially admitted during his deposition that ArthroCare's statements had been accurate. *See* Long Decl. ¶¶ 13, 15.

1  U.S. 579 (1993), ArthroCare seeks to exclude the testimony of Gregory B. Taylor (Taylor"),
2  Allied's expert witness for damages, on the ground that Taylor's opinion is not based on
3  specialized knowledge, sufficient independent facts or data, or reliable principles and methods.
4  ArthroCare also seeks to exclude any evidence with respect to potential damages incurred after
5  March 5, 2005 on the ground that the Distribution Agreement would have terminated on that
6  date.  Because the subject matter of Taylor's testimony is no longer relevant, the Court will
7  terminate ArthroCare's motion as moot.

### III. ORDER

Good cause therefore appearing, IT IS HEREBY ORDERED that ArthroCare's motion for summary judgment on all of Callison's individual claims and on the claims by Allied for libel and slander is GRANTED.  ArthroCare's motion for summary judgment on Allied's claim for breach of contract is GRANTED IN PART AND DENIED IN PART.  As set forth above, the motion to exclude the testimony of Allied's expert witness is TERMINATED as moot.  Because Allied's damage claims now are limited to ArthroCare's apparent failure to deliver all of the free controllers due under the Incentive Agreement, the parties may wish to revisit the status of the instant litigation and the possibility of a negotiated settlement.  In light of the impending trial date, the Court directs counsel to appear at a status conference on Friday, May 29, 2009 at 10:30 a.m.

IT IS SO ORDERED.

DATED: May 20, 2009

_____
JEREMY FOGEL
United States District Judge

1  This Order has been served upon the following persons:

2  A. Bryan Diaz     bryan.diaz@berliner.com

3  Bradley M. Corsiglia     bmc@cmalaw.net, vfernandez@cmalaw.net

4  Christine H. Long     christine.long@berliner.com, julie.willson@berliner.com

5  John Case     case@bensoncase.com

6  Joseph E Dworak     jed@berliner.com

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28